STATE OF MAINE
CUMBERLAND, ss

STATE OF MAINE
Cumberland, ss, Clerk's Office
SUPERIOR COURT

SEP 02 2009

RECEIVED

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-08-636

DANA WARP MILL, LLC
    Plaintiff

v.

CHARLES UNGER
d/b/a FORE RIVER STUDIO,

JOSEPH POLLAK
d/b/a KNOCK ON WOODWORKS,

and

CASCO BAY BUILDERS, INC.
d/b/a KNOCK ON WOODWORKS,

    Defendants

ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT

## BEFORE THE COURT

Before the court is Defendants' Joseph Pollak and Casco Bay Builders

(both d/b/a "Knock on Woodworks") Motion for Summary Judgment pursuant

to M.R. Civ. P. 56. Defendant Charles Unger (d/b/a Fore River Studio) also filed

a Motion for Summary Judgment, joining in part in the reasoning of his co-

defendants' motion.

## PROCEDURAL HISTORY

Plaintiff filed suit on November 10, 2008, to recover damages from a fire

that occurred at Dana Warp Mill on June 8, 2008. The fire started in Defendants'

woodworking shop, in space the Defendants co-leased in the Dana Warp Mill.

Plaintiff's suit is a subrogation claim pursuant to M.R. Civ. P. 17(c). The insurer

in this case is Lloyd's of London. Plaintiff asserts three claims in the Complaint:

Count I alleges Defendants were negligent; Count II asserts a claim of Trespass

related to fire, smoke, and water damage; and Count III asserts Defendants are

1

strictly liable because their abnormally dangerous activity – the application of flammable chemicals to furniture with a spray gun – caused the fire.

## FACTUAL BACKGROUND

Dana Warp Mill, LLC was formed in 2000. Following formation, it purchased the assets of CCK Realty Trust, including the Dana Warp Mill – a property consisting of approximately 200,000 square feet of leasable space. Timothy Flannery was a co-owner of CCK Realty Trust, and is the sole owner of Dana Warp Mill, LLC. Beginning on September 1, 1999, and continuing through June 8, 2006, Defendants Charles Unger and Joseph Pollak co-leased unit 365 of the Dana Warp Mill. Unit 365 consists of approximately 4,500 square feet of commercial space. Neither could afford the workspace on their own so they alternated paying the monthly rent. Unger is the sole proprietor of Fore River Studio. Unger manufactures residential wooden furniture and custom cabinetry. Pollak is the president of Casco Bay Builders, doing business as Knock on Woodworks. Pollak also builds custom residential wooden cabinetry and furniture. Pollak used the western portion of the workspace in Unit 365, and Unger used the eastern portion of the workspace. While the two occasionally would coordinate on large projects, they have separate and independent businesses and have no formal business relationship.

A few months after moving into the workspace, Unger and Pollak constructed a spray booth, in which they applied lacquer and other finishes to their products. Only one person at a time could use the booth. Unger and Pollak designed and constructed the booth, and they allegedly consulted with the Westbrook Fire Chief with regard to fire safety issues prior to building the booth.

2

Pl.'s Opp. S.M.F. ¶18; Ex. B. pp. 47–48. Both Unger and Pollak used the spray booth for nearly six years without incident.

On the evening of June 7, 2006, Unger (1) used a high pressure, low volume spray gun to spray a veneered dry bar with lacquer, (2) he used a high pressure, low volume cup gun to spray two end tables with an oil based paint thinned with Penetrol and paint thinner, and (3) he applied a mixture of varnish, Penetrol, paint thinner, and a chemical catalyst to a piece of plywood. Prior to June 7th, Unger does not recall having used Penetrol within the spray booth. According to Plaintiff's expert, Penetrol's MSDS[1] form states that it has the ability to spontaneously combust. When Unger was finished work around 10:00 p.m., he ran an exhaust fan for 20 minutes, turned off the lights to the workspace, and went home. Unger was the last known person to enter the spray booth.

Around 9:00 a.m. the next morning, on June 8th, Pollak saw smoke billowing out of both spray booth vents. He entered the spray booth with a fire extinguisher where he saw white smoke at the ceiling and dark colored liquid on the floor. Pollak turned the exhaust fan on and the fire department arrived. The fire department instructed Pollak to leave the spray booth and turn off the power. As he walked to the electrical panel he noticed a small fire on the floor of the spray booth, which quickly turned into a large fire with flames up to the ceiling. Opp. S.M.F. ¶ 30. The sprinkler and fire alarm activated and Pollak exited the building. The fire caused approximately $260,000 in damage to the building.

---

[1] "MSDS" stands for material safety data sheets. MSDS forms provide information regarding a substance's properties, and also include information related to a substance's toxicity, health effects, storage, and spill handling procedures.

Plaintiff's expert Donald Hoffman, Ph.D, a specialist in the science and engineering of analyzing fires and explosions, offers the following opinion regarding the fire:

> [T]he fire started as a result of the misuse and/or mishandling of hazardous, flammable/ combustible materials in the spray booth . . . . Defendant Charles Unger was using a chemical known as Penetrol the evening before the fire was discovered. The Penetrol was mixed with oil based paint and possibly thinner, and was applied to a wood surface with a spray applicator. The process resulted in overspray so that the mixture containing the Penetrol was also applied to the surfaces around the work piece, including the barrel used for a work stand and the floor, among other things. There was debris on the floor including sawdust and other overspray residue, and used rags were also likely in the area. The Penetrol waste was not properly disposed of. It is likely the Penetrol spontaneously combusted and started a smoldering fire in the spray booth. There was flammable liquid on the floor of the spray booth which was ignited shortly after Mr. Pollack [sic] discovered the smoke from the smoldering fire.
>
> The fire was caused by the misuse and mishandling of the Penetrol and other flammable liquids. The overspray and sawdust and accumulation of other flammable liquids should have been cleaned up and removed. Used rags should have been removed from the spray booth and properly disposed of. The flammable liquid stored in the spray booth and accumulated on the floor of the spray booth should have been cleaned up properly and removed. Had these flammable and combustible materials, including Penetrol, and their wastes been properly used, handled and stored, this fire would not have occurred. The Defendants knew or should have known about the proper storage, handling and use of the products and should have taken appropriate steps to mitigate the hazards so a fire did not occur.

Def.'s S.M.F., Ex. D, pp. 1–2.

After the fire, Dana Warp Mill, LLC made a claim with Lloyd's of London, the insurer, for $253,127.18 as a result of the fire. Lloyd's of London paid the entirety of the claim through East Coast Claims Services, Inc. Dana Warp Mill has not recovered its $5,000 deductible.

4

As of June 8, 2006, the original lease between Unger and Pollak and the Dana Warp Mill had expired, such that Unger and Pollak were leasing Unit 265 on a month-to-month basis. Flannery claims it was understood that the month-to-month oral lease was under the same terms as the previous lease, and Unger and Pollak understood that they could be liable for damage to the building. Flannery Dep. at 63:19-4:12. According to Unger and Pollak, there were no written documents in effect that specifically advised them that they would be liable in subrogation for fire damage. The August 29, 2005 letter from Flannery that put Unger and Pollak on notice of their month-to-month tenancy made no mention of the terms of the prior lease. Flannery Dep., Ex. 3. The original lease required Unger and Pollak to maintain property insurance.[2] Flannery Dep. at 63:19-4:12; Unger Dep., Ex. 1, cl. 9.

Throughout Pollak's and Unger's tenancy, CCK Realty Trust or Dana Warp Mill, LLC maintained an insurance policy on the buildings at Dana Warp Mill. Opp. S.M.F. ¶ 31. Around November 2000, Flannery received a letter from Dana Warp Mill's insurer stating that the spray booth was not constructed to code, and as a result the Mill's insurance premium increased. In response, on November 29, 2000, Flannery sent Unger and Pollak a letter notifying them that the insurance premium had increased due to the spray booth, and that he was passing the cost increase onto them pursuant to the lease.[3] The letter stated the

---

[2] While it is not clear what type of insurance Unger and Pollak had, their depositions indicate that they did have insurance policies. Unger Dep. at 114. Pollak says he was insured through the Concord Group. Pollak Dep. at 14.

[3] Paragraphs 5(B)(4) and 5(C) of the lease provide that if there is a breach of the lease the "Landlord may at its option either declare the Tenant in default of their lease and exercise its rights and remedies pursuant to paragraph #12 or charge Tenant, as additional rent, for the portion of all insurance premiums previously or thereafter paid by Landlord charged

insurance premium for the last four months had increased by $654.58 per month. Flannery required Unger and Pollak to pay $2,618.32 to cover the increased cost for the last four months, and stated that Unger and Pollak would have to pay "an additional $654.58 per month until this matter is resolved." Flannery Dep., Ex. 4. Unger and Pollak paid the $2,618.32, and made changes to the spray booth to bring it up to code.

While the insurance premium did not decrease, Unger and Pollak did not continue to pay the extra $654.58 per month, and the issue "went away." Pollak Dep. at 114:19–21. Flannery never sent Unger and Pollak another bill for the increased premium because he believed that the rental income he received from Unger and Pollak, which he used in part to pay for insurance on the property, "was adequate to pay for their pro rata share of the insurance premium." Flannery Dep. at 36–37.

Defendants Pollak and Casco Bay Builders filed a motion for summary judgment on three issues. Defendant Unger filed a motion for summary judgment, joining Defendants Pollak and Casco Bay Builders on their first and third ground for summary judgment. Defendants' first motion claims that based on *North River v. Snyder*, 804 A.2d 399 (Me. 2002), Lloyd's of London, as subrogee of Dana Warp Mill, LLC, cannot recover from the Defendants the $253,127.18 it paid to cover the cost of the fire damage. Second, Defendants Pollak and Casco Bay Builders claim that Dana Warp Mill, LLC cannot present prima facie evidence of negligence because Pollak was not a proximate cause of the fire.

by Landlord's insurer due to Tenant's breach of any provisions of this paragraph #5." Unger Dep., Ex. 1.

Third, Defendants claim they are not strictly liable because spraying paint cannot be considered an abnormally dangerous activity.

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). In considering a motion for summary judgment, the court should consider the facts in the light most favorable to the non-moving party, and the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Johnson v. McNeil*, 2002 ME 99, ¶ 8, 800 A.2d 702, 704. A contested fact is "material" if it could potentially affect the outcome of the suit under the governing law. *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747. A fact is "genuine" if there is sufficient evidence supporting the claimed fact to require a fact-finder to choose between competing versions of facts at trial. *Id.* For the purposes of summary judgment, factual disputes and ambiguities must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924, 926.

### II. Applicability of the Anti-Subrogation Rule

The Defendants' first ground for summary judgment asks the court to extend the anti-subrogation rule to commercial leases based on the holding in *North River Ins. Co. v. Snyder*, 2002 ME 146, 804 A.2d 399. Defendants claim they

7

were "co-insured" under Dana Warp Mill's insurance policy.[4] The *Snyder* court held that "a residential tenant may not be held liable in subrogation to the insurer of the landlord for damages paid as a result of a fire . . . absent an express agreement in the written lease that the tenant is liable in subrogation for fire damage." *Snyder* at ¶ 1, 804 A.2d at 400. "The anti-subrogation rule announced in *Snyder* is based on considerations of economic waste in the procurement of insurance and the reasonable expectations of a landlord and a tenant." *The Norfolk & Dedham Group of Ins. Companies v. Kostovick*, 2009 Me. Super. LEXIS 50, *8. The *Snyder* court only applied the anti-subrogation rule to residential tenancies based in part on the belief that "commercial tenants tend to be more sophisticated about the terms of their leases" than residential tenants. *Snyder*, at ¶ 15, 804 A.2d at 403, n. 7 (citing *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 950 (Mass. 2002)).

The argument that the anti-subrogation rule should be applied to commercial tenancies is not without support. In applying the rule to commercial tenancies, the Connecticut Supreme Court stated that a rule requiring the tenant to maintain insurance in anticipation of a subrogation claim is wasteful: "Such a rule would create a strong incentive for every tenant to carry liability insurance in an amount necessary to compensate for the value, or perhaps even the

---

[4] The Defendants argue based on the implied co-insured doctrine that they are co-insured under Dana Warp Mill's insurance policy. That doctrine provides that absent an express agreement to the contrary, the tenant can be considered co-insured under the landlord's insurance policy because (1) "both parties have an insurable interest in the premises, the former owns the fee, and the latter has a possessory interest"; (2) the landlords purchased fire insurance to "protect such interests . . . as a matter of sound business practice the premium paid had to be considered in establishing the rent rate"; and (3) it follows that "the tenant actually paid the premium as part of the monthly rental." *Snyder*, at ¶ 13, 804 A.2d at 403 (citing *Sutton v. Jondahl*, 532 P.2d 478, 482 (Okla. App. 1975)).

replacement cost, of the entire building, irrespective of the portion of the building occupied by the tenant." *DiLullo v. Joseph*, 259 Con. 847 * 854, 792 A.2d 819, 823 (Conn. 2002).

However, Defendants' request for application of the anti-subrogation rule and the implied co-insurance doctrine fails based on the express terms of their lease agreement. First, the fact that Defendants were holdover tenants subject to a month-to-month tenancy at the time of the fire is not determinative in this case. Generally, the legal relationship of the landlord and tenant during a holdover tenancy is governed by the terms of the prior lease. RESTATEMENT (SECOND) OF PROP: LANDLORD AND TENANT, § 14.7 (1977). The prior lease required the Defendants to carry indemnity and public liability insurance. Clause 9 of the prior lease states that "[t]he provisions of this paragraph shall survive the termination or early expiration of the term of his lease." Unger Deposition, Ex. 1, cl. 9. Because the terms of the prior lease generally control during a holdover tenancy, and because clause 9 of the lease requires insurance to continue beyond the termination of the original lease, the Defendants' claim that no written agreement governed the month-to-month tenancy fails.

Second, the anti-subrogation rule only applies absent an express agreement in the written lease. As previously stated, the Defendants agreed in their lease to carry Indemnity and Public Liability Insurance. Specifically clause 9(A) of the lease states:

> Tenant will defend and indemnify Landlord and save Landlord harmless from any and all claims, actions, damages, liability and expense . . . in connection with the loss of life, personal injury or damage to property of business arising from, related to, or in connection with the occupancy or use by Tenant of the Leased Premises . . . .

Additionally, clause 9(B) of the lease states:

> Tenant agrees to maintain in full force during the term
> hereof a policy of public liability and property damage
> insurance under which Tenant is named as insured and
> Landlord as additional insured, and under which the insurer
> agrees to indemnify and hold Landlord and those in privity
> with Landlord harmless from and against any and all costs,
> expenses and/or liability arising out of or based upon any
> and all claims, accidents, injuries, and damages mentioned
> in [clause 9(A)] . . . . The minimum amount of liability of
> such insurance shall be . . . $100,000.00 with respect to
> property damage.[5]

The requirements under the lease are unambiguous and are sufficient to put the

Defendants on notice that they could be held liable to the Landlord's insurer in a

subrogation claim. Given that there are express contractual terms regarding

indemnity in the Defendants' lease, the anti-subrogation rule is not applicable.

Defendants claim they are co-insured under Dana Warp Mill's insurance

policy because Flannery charged them increased insurance and used rental

income to pay for the Defendants' "pro rata share of [the] insurance premium."

This argument fails due to the terms of the lease as well. Under clause 9(D),

tenants agreed to pay for the landlord's increased insurance expenses if the

increase was a result of the tenants' use of the premises. It was permissible

under the lease to pass the increased costs on to Unger and Pollak, and it only

makes sense that a landlord would pay for insurance costs out of rental proceeds.

### III. Defendant Pollak and the Issue of Proximate Causation

Defendants Pollak's and Casco Bay Builders' second ground for summary

judgment argues that Pollak's conduct was not a proximate cause of the fire.

This motion is based on the fact that it was Unger, and not Pollak, who used the

---

[5] The record does not indicate whether the tenant procured the insurance required by this provision.

chemical Penetrol, which is believed to have caused the fire through spontaneous combustion.

Generally, the issue of proximate cause is a question of fact for the jury. Simmons, Zillman & Gregory, *Maine Tort Law* § 7.13 (2004 ed.) at 7–34. "The question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact, and judgment as a matter of law is improper if any reasonable view of evidence could sustain a finding of proximate cause." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757, 759. The foundational basis for proximate causation is the reasonable foreseeability of the injury. *Brewer v. Roosevelt Motor Lodge*, 295 A.2d 647, 652 (Me. 1972). "An injury or damage is a reasonably foreseeable consequence of an act or failure to act when that act or failure to act creates a risk which might reasonably be expected to result in the injury or damage in question, even though the exact person injured or the exact nature of the injury need not, itself, be foreseeable." DONALD G. ALEXANDER, MAINE JURY INSTRUCTION MANUAL § 7–80 (3rd ed. 2009). Under Maine law, it is possible that there may be more than one proximate cause to a particular accident. *Fournier v. Rochambeau Club*, 611 A.2d 578, (Me. 1992).

A jury could find Defendant Pollak's conduct to be a reasonably foreseeable factor in causing the fire. As Plaintiff's expert Dr. Hoffman will opine, the fire was caused by misuse and mishandling of flammable liquids and materials in the spray booth. While Penetrol may have been the final ingredient that started the fire, both Unger and Pollak could be found to have contributed to the fire through the improper storage of chemicals and flammable liquids, and through the failure to dispose of overspray, sawdust, and rags inside the spray booth. Because it is possible Dana Warp Mills could show that Defendant Pollak

11

was a proximate cause of the fire, Pollak's motion for summary judgment on the issue of proximate causation is denied.

## IV. Abnormally Dangerous Activity

Defendants' seek summary judgment on Count III of the Plaintiff's Complaint, which classifies the Defendants' conduct as an abnormally dangerous activity. Dana Warp Mill's Complaint asks the court to hold Defendants strictly liable for applying flammable chemicals with a spray gun. The application of strict liability based on abnormally dangerous activity remains an open question in the State of Maine. *Thompson's Point Inc. v. Gates Formed-Fibre Prods.*, 1997 Me. Super. LEXIS 262 *9 *(Sept. 3, 1997) (stating that "the Law Court has not adopted the concept of strict liability with respect to dangerous activities").

In support of the position that Defendants' should be strictly liable for their activity, Dana Warp Mill cites authority from other jurisdictions that hold that "the storage of highly flammable substances is an abnormally dangerous activity." Pl.'s Opp'n to Def.'s Mot. Summ. J. at 14. However, these cases are distinguishable based on the fact that they involve defendants that manufactured or stored large volumes of chemicals.

The court turns to the Restatement to determine if the application of flammable chemicals with a spray gun is an abnormally dangerous activity. The Restatement identifies six factors to consider in determining if an activity is abnormally dangerous.[6] RESTATEMENT (SECOND) OF TORTS § 520 (1977). While

---

[6] According to section 520 of the Restatement (Second) of Torts, "[i]n determining whether an activity is abnormally dangerous, the following factors are to be considered
    (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
    (b) likelihood that the harm that results from it will be great;

applying flammable chemicals with a spray gun may present a high risk of harm, that risk can be minimized or eliminated through the use of reasonable care. In this case, Defendants' took precautions by constructing a spray booth designed to comply with fire safety code. Also, Dr. Hoffman identified several precautions that could have been taken to minimize the risk of fire. These precautions indicate that the risks presented by these flammable chemicals can be eliminated through reasonable care. Additionally, the application of flammable chemicals to wood products is a common activity. Many of the chemicals present in Defendants' spray booth (paint, paint thinner, and lacquer) are also present in the garages and basements of hobbyists and do-it-yourselfers across the State. Using and storing the flammable chemicals at issue in this case is too common for the application of a strict liability standard.

Based on these factors, the court grants the Defendants' motion for summary judgment on the issue of abnormally dangerous activity.

---

(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.

Therefore, the entry is:

Defendants' Motion for Summary Judgment on the applicability of the anti-subrogation rule is DENIED.

Defendant Pollak's Motion for Summary Judgment on the issue of proximate causation is DENIED.

Defendants' Motion for Summary Judgment on the issue of Abnormally Dangerous Activity is GRANTED.

Dated at Portland, Maine this ___2ND___ day of ___September___, 2009.

Robert E. Crowley
Justice, Superior Court

14

## STATE OF MAINE
### CUMBERLAND COUNTY SUPERIOR COURT

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

J WILLIAM DRUARY ESQ
MARDEN DUBORD BERNIER & STEVENS
PO BOX 708
WATERVILLE ME 04901-0708

---

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

STEPHEN BELL ESQ
ROBINSON KRIGER & MCCALLUM
PO BOX 568
PORTLAND ME 04112

---

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

BLAIR JONES ESQ
FRIEDMAN GAYTHWAITE WOLF & LEAVITT
PO BOX 4726
PORTLAND ME 04112

---

## STATE OF MAINE
### CUMBERLAND COUNTY SUPERIOR COURT

142 FEDERAL STREET
PORTLAND, MAINE 04101

To:

BRENDAN RIELLY ESQ
JENSEN BAIRD GARDNER & HENRY
PO BOX 4510
PORTLAND ME 04112